

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 05-098 |
| JEROME LEBLANC | SECTION "F" |

### ORDER AND REASONS

Before the Court is the defendant's Motion to Suppress Evidence.[1] For the reasons that follow, the defendant's motion is DENIED.

### Background

The defendant is before this Court charged as a felon in possession of a firearm.

On January 14, 2003, Jerome LeBlanc was convicted of contractor misapplication of payments, in violation of LA-R.S. 14:202, and placed on probation for five years. Among the state court-ordered conditions of his probation,[2] Mr. LeBlanc agreed to

---

[1] On August 18, 2005, this Court held an evidentiary hearing wherein the defendant, Jerome LeBlanc, and his probation officer, Agent Todd Cruice, testified.

[2] The defendant signed the probation order, which stated immediately above the defendant's signature: "I understand all of the above conditions which have been read to me and I solemnly promise and agree to obey them."



"[p]ermit the probation officer to visit [him] at home or elsewhere." Mr. LeBlanc also agreed to "[r]efrain from owning or possessing firearms or other dangerous weapons" and to "[m]ake reasonable reparation or restitution" to aggrieved parties.

During the evening of July 29, 2004, the defendant's state probation officer, Agent Todd Cruice, arrived at the defendant's home to conduct a home visit. It was Agent Cruice's third attempt to visit Mr. LeBlanc.[3] When Agent Cruice got to the defendant's home in his car, the defendant was outside with his dog. After the defendant restrained his dog, Agent Cruice exited his car and introduced himself to Mr. LeBlanc.[4]

Agent Cruice told the defendant that he was there to conduct a home visit and asked if he could "look around" the defendant's house.[5] The defendant agreed and then led Agent Cruice into his

---

[3] Agent Cruice testified that, on two prior attempts, the defendant had not been home, but the defendant's dog had barked at his car on his arrival at the defendant's home.

[4] Mr. LeBlanc's prior probation officer had visited him at his home about a year before Agent Cruice's July 29th visit. Mr. LeBlanc testified that his prior probation officer had arrived at the front door, asked if there was a place to sit and talk, and the defendant led the probation officer to the kitchen. The house is similar to a shotgun style house in design and the kitchen is at the opposite end of the front door, so they had to walk through the living room and dining room in order to sit down at the kitchen table.

[5] Agent Cruice testified that the general purpose of a home visit was to verify compliance with the terms of probation, such as to verify that the probationer lives where he says and that the residence is suitable (not overcrowded and not residing with other felons). More specific purposes for his visit at Mr.

house through the kitchen.[6]  When Agent Cruice closed the kitchen door, he saw a pellet gun.  Agent Cruice inspected it to ensure it was not a firearm.  The defendant said that he kept it for snakes and varmints in his yard, explaining that the area where he lives is rural and rather undeveloped.  The defendant denied having any other weapons in the house.

Agent Cruice asked the defendant to show him around the house.  LeBlanc showed him the kitchen, his workspace, his living room, his daughter's bedroom, and the bathroom.[7]  When they reached the defendant's bedroom, the defendant opened the door and announced that the room was his bedroom.  Agent Cruice entered the room,[8] where he saw what appeared to be a storage room adjoining the defendant's bedroom.  Agent Cruice looked in the storage room.  When he turned to exit the storage room, he was standing

---

LeBlanc's house was to ensure that the defendant was not living outside of his means.  Agent Cruice testified that these purposes can be accomplished by physically viewing the residence, including by a casual, visual inspection of the residence.

[6] The defendant disputes the government's contention that he preceded Agent Cruice throughout his home.  The Court, however, credits Agent Cruice's testimony, including that it would not have been tactically sound to allow the defendant, whom he had never met before, to stay behind him and out of sight.

[7] As the defendant led Agent Cruice through his home, the defendant made small talk about the house, including work he was doing on the house and how he had built a large loft bed for his daughter.

[8] The defendant did not precede Agent Cruice into his bedroom, but did not object to his entry.

3

approximately six feet away from the defendant's bed. It was from that vantage point that Agent Cruice plainly saw the barrel of a shotgun underneath the defendant's bed. Given the position of the gun,[9] the eight inches of space between the bed and the floor, and the absence of any bed skirt or dust ruffle, Agent Cruice's view of the gun was unobstructed from his vantage point several feet away.[10]

The entire home visit lasted less than 10 minutes and the walk-through lasted approximately two to three minutes. Agent Cruice did not physically move anything, open drawers, or rifle through personal belongings; rather, he used only his eyes.[11]

The defendant now seeks to suppress the rifle seized from under his bed.

### Law and Application

The defendant does not dispute that Agent Cruice's visit to his home was authorized by a condition of his probation. He only asserts that Agent Cruice exceeded the scope of a home visit and

---

[9] Agent Cruice testified that the gun was laying lengthwise, just even with the edge of the bed in a position for easy retrieval. The gun was loaded with a 410 shotgun round.

[10] The defendant concedes that there were approximately eight inches of space between the floor and the bottom of the bed, but disputes Agent Cruice's testimony that the view of the gun was unobstructed. Rather, the defendant contends that the comforter on his bed hung down to approximately eight inches above the floor, thereby obstructing the view of the gun.

[11] The defendant disputes Agent Cruice's testimony that he did not open any boxes or rifle through any possessions. The Court credits Agent Cruice's testimony.

instead conducted a full blown search without a warrant, reasonable suspicion, or consent. The defendant invites the Court to restrict, as a matter of law, a probation officer's conduct during a home visit to one room of the house or to confine the visit to kitchen table chat. The Court declines the defendant's invitation and instead finds, based on the testimony and evidence at the suppression hearing, that Agent Cruice's casual walk-through of Mr. LeBlanc's home, wherein he saw a gun in plain view, did not offend his diminished expectation of privacy.[12]

### A.

The Fourth Amendment prohibits only unreasonable government intrusions into legitimate expectations of privacy.[13] <u>Carroll v. U.S.</u>, 267 U.S. 132 (1925); <u>U.S. v. Chadwick</u>, 433 U.S. 1, 7 (1977). Warrantless searches are presumptively unreasonable. <u>Katz v. U.S.</u>, 389 U.S. 347 (1967). Certain law enforcement practices are excepted from this general rule when the promotion of legitimate governmental interests outweighs its intrusion on a reasonable expectation of privacy. <u>Texas v. Brown</u>, 460 U.S. 730, 739 (1983)

---

[12] Because the Court finds that Agent Cruice's conduct was authorized by the terms of the defendant's probation and did not amount to a search, the Court need not address the remaining contentions of the parties.

[13] The Court's own research notes two Fifth Circuit decisions, which do not seem applicable to the court-ordered supervision condition setting, and, moreover, which the Court notes are doctrinally inconsistent: <u>U.S. v. Jaquez</u>, 421 F.3d 338 (5th Cir. 2005); <u>U.S. v. Gibbs</u>, 421 F.3d 352 (5th Cir. 2005).

(citation omitted). One such exception is the one relied upon by the government in this case, the plain view doctrine. Under that doctrine, a law enforcement officer may seize contraband if the officer is in a lawful position from which he views an object, its incriminating character is immediately apparent, and if the officer has a lawful right of access to the object. Horton v. California, 496 U.S. 128, 137-37 (1990).

It is well established that probationers have a diminished expectation of privacy.[14] Griffin v. Wisconsin, 483 U.S. 868, 873-75 (1987) ("A State's operation of a probation system...presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements"); U.S. v. Knights, 534 U.S. 112 (2001); State v. Malone, 403 So.2d 1234 (La. 1981). That is, probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only...conditional liberty dependent upon observance of special [probation] restrictions." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) (citing Morrissey v. Brewer, 408 U.S. 471, 480 (1972)).

This "conditional liberty" of probationers may be manifested in any number of express conditions of probation, such as a condition authorizing warrantless searches of the probationer's

---

[14] This results from the probationer's prior conviction and his agreement to conditions of probation that permit the probation officer to supervise his activities to confirm compliance with those conditions. See U.S. v. Knights, 534 U.S. 112 121 (2001).

home, or a less intrusive condition -- like the one at issue here -- requiring a probationer to submit to home visits by probation officers.  In U.S. v. Knights, 534 U.S. 112 (2001), the Supreme Court observed, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."  As to warrantless searches, the Supreme Court has even upheld warrantless non-consensual searches of probationers' homes when supported by no more than reasonable suspicion and authorized by a search condition of probation.[15]  Id. at 121 (concluding that search was reasonable by applying the general Fourth Amendment "totality of the circumstances [test], with the probation search condition being a salient circumstance").

While it has been established that probation officers are subject to the reasonable suspicion standard in the context of probation search conditions,[16] the home visit context is less

---

[15] This is because a probationer "is more likely than the average citizen to violate the law"; thus, the Fourth Amendment balance of governmental and private interests reduces the level of suspicion to that of reasonable suspicion.  Id.  The Court notes that, this term, the Supreme Court is scheduled to resolve whether the Fourth Amendment prohibits *suspicionless*, warrantless searches of parolees subject to a parole search condition.  Samson v. California, 126 S.Ct. 34 (Sept. 27, 2005) (granting petition for writ of certiorari).

[16] The Fifth Circuit and the state of Louisiana have also adopted the reasonable suspicion standard for searches of probationer's homes, even without a search condition of probation.

settled. Decisions of other jurisdictions provide a helpful guide. The Second Circuit Court of Appeals has held that, because home visits are less invasive than searches, probation officers conducting home visits are not subject to the reasonable suspicion standard applicable to probation searches under Knights. U.S. v. Reyes, 283 F.3d 446, 462 (2d Cir. 2002). The Ninth Circuit has also held that probationers lack reasonable expectations of privacy with respect to home visits because:

> (1) probationers are informed in supervision agreements that probation officers conduct home visits; (2) probationers enjoy only conditional liberty; (3) any such expectation of privacy is not one that society recognizes as reasonable; and (4) the probationer is aware that...one of the primary tasks of a probation officer is to determine the conditions and circumstances of the probationer's living arrangements.

U.S. v. Hedrick, 2005 WL 2043898, at *1 (9th Cir. Aug. 25, 2005).

In U.S. v. Massey, the Southern District of New York denied a defendant's motion to suppress a machete seized from a defendant's bedroom. 2004 WL 1243531, at *3-4 (S.D.N.Y. Jan. 21, 2004) (finding that "[r]outine parole visits are generally conducted to establish that the parolee is complying with [the terms of parole]...[d]uring a parole visit, parole officers conduct a plain view examination of the residence and do not typically open drawers

---

U.S. v. Keith, 375 F.3d 346, 350 (5th Cir. 2004); State v. Malone, 403 So.2d 1234, 1239 (La. 1981).

or closets"). Other courts have more generally discussed the validity of home visits in the context of a motion to suppress, as well as the "common sense distinction" between a search and a home visit more generally. See, e.g., U.S. v. Trzaska, 866 F. Supp. 98, (E.D.N.Y. 1994) (suppressing evidence seized in unlawful search and contrasting lawful home visit, where plain view doctrine would have permitted them to seize evidence in plain view, with search characterized by forcible entry); Diaz v. Ward, 506 F. Supp. 226 (S.D.N.Y. 1980).[17]

### B.

Applying these principles, the Court finds that Agent Cruice's plain view seizure of the gun from under Mr. LeBlanc's bed comported with the Fourth Amendment. Agent Cruice visited the defendant at his home pursuant to a court-ordered condition of probation. The nature and scope of the walk-through did not offend Mr. LeBlanc's diminished expectation of privacy and was not, as the defendant contends, tantamount to a search. Rather, the intrusion was limited: (i) the walk-through lasted only a few minutes, (ii)

---

[17] Diaz was a class action suit filed by parolees and persons residing with parolees against the administrators of the New York state parole program for alleged violations of constitutional rights. The Southern District of New York held that a parolee or his family may properly limit a parole officer conducting a home visit to one room of the residence. Id. The court reasoned that such a limitation was permissible because the parole officer "on the basis of his observation of the parolee and conversation with him, may gather the information necessary to achieve the visit's limited purposes." Id.

the defendant did not deny access to any rooms and, indeed, led the way through his house, (iii) Agent Cruice did not move any furniture or open any drawers or boxes.[18]

Moreover, the home visit is a necessary court-ordered supervisory tool to be utilized by the probation officer to confirm compliance with conditions of probation. The Court stresses that the government's interest in supervising probationers rationally outweighs any minimal intrusion on the defendant's diminished expectation of privacy resulting from a visual inspection of the home.[19]

Because Agent Cruice's authority to visit the defendant placed him lawfully in the defendant's house, a simple application of the plain view doctrine validates the seizure of the defendant's gun. The defendant led Agent Cruice inside and on a visual tour of each of the rooms in his house and did not deny access to any rooms. Agent Cruice entered the defendant's bedroom in order to view the

---

[18] Agent Cruice contrasted his conduct during this home visit with how procedure requires him to conduct a search. The former mechanism involves a lesser intrusion and includes a visual inspection. The latter procedure calls for handcuffing and securing the offender, clearing the house for any other persons, and then a thorough search (including by moving furniture and touching and opening things in the house to find whatever contraband is the object of the search).

[19] The defendant urges the Court to restrict a probation officer's conduct during a home visit to one room of the house, contemplating a kitchen table chat between the probationer and probation officer. Such an artificial restriction would hinder the probation officer's supervisory role and betrays the concept of reasonableness that is touchstone of the Fourth Amendment.

adjacent storage room.  It was from this lawful vantage point that he saw the defendant's gun underneath his bed.[20]  His view of the gun was unobstructed, given its placement at the edge of the bed, the eight-inch space between the bed and the floor, and the fact that Agent Cruice was standing approximately six feet from the edge of the bed.  Such a plain view seizure does not impinge on Mr. LeBlanc's diminished Fourth Amendment rights.

Accordingly, the defendant's Motion to Suppress Evidence is DENIED.


New Orleans, Louisiana, November 23, 2005.

                                  _____
                                       MARTIN L. C. FELDMAN
                                    UNITED STATES DISTRICT JUDGE

---

[20] None of the other elements of a plain view seizure is disputed.